ORIGINAL

IN THE MATTER OF:

# Donald Canterbery
## vs.
# John Petrovich, M.D.

*Cause No. 3:06-cv-792-MJR-PMF*

*Deposition of Donald Canterbery*
*11/14/2006*

**Gore Perry Gateway Lipa Baker Dunn & Butz**
**Certified Court Reporters & Legal Videographers**
**1-800-878-6750**

EXHIBIT
**B**

DepoScript3

## Page 3

```
1              In the United States District Court
2              Southern District of Illinois
3
4
5     DONALD CANTERBERY,
6
7                    PLAINTIFF,
8
9     vs.         Cause No. 3:06-CV-792-MJR-PMF
10
11    JOHN PETROVICH, M.D.,
12
13                    DEFENDANT.
14
15         Deposition of DONALD CANTERBERY,
16    taken on behalf of the DEFENDANT, at Husch &
17    Eppenberger, 190 Carondelet Plaza, St. Louis,
18    Missouri, on NOVEMBER 14, 2006, before
19    Margaret M. Clodius, Missouri CCR #948, and
20    Notary Public within and for the State of
21    Missouri.
22
23
24
25
```

## Page 3 (right)

```
1     APPEARANCES OF COUNSEL:
2
3         For DEFENDANT:
4         Mr. Justin A. Relihan
5         Husch & Eppenberger
6         190 Carondelet Plaza
7         St. Louis, Missouri  63105
8
9         FOR DEFENDANT:
10        Mr. Todd N. Hendrickson
11        Law Office of Todd N. Hendrickson
12        100 South Brentwood, Suite 300
13        Clayton, Missouri  63105
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2                    INDEX
3
4                             PAGE
5
6     Examination by Mr. Relihan      5
7     Examination by Mr. Hendrickson  61
8     Examination by Mr. Relihan      70
9
10            DEFENDANT'S EXHIBIT INDEX
11
12    Exhibits 1 - 4              5
13    Exhibit 5                   8
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1     (Defendant's Deposition Exhibits 1 - 4 marked
2              for identification)
3              DONALD CANTERBERY,
4         of lawful age, having been first duly
5     sworn to testify the truth, the whole truth,
6     and nothing but the truth in the case
7     aforesaid, deposes and says in reply to oral
8     interrogatories propounded as follows, to-wit:
9         MR. HENDRICKSON:  On the record, can
10    we get the stipulation that this is a
11    deposition only on the subject of
12    jurisdictional grounds and diversity
13    jurisdiction and for no other purposes today.
14        MR. RELIHAN:  Correct.
15        MR. HENDRICKSON:  Okay.
16                    EXAMINATION
17        QUESTIONS BY MR. RELIHAN:
18        Q:   Sir, could you please state your name
19    and spell your last name for the record?
20        A:   Donald Wayne Canterbery,
21    C-A-N-T-E-R-B-E-R-Y.
22        Q:   And what's your Social Security
23    Number?
24        A:   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.
25        MR. RELIHAN:  Let the record reflect
```

1  this is the deposition of Donald Wayne
2  Canterbery taken pursuant to notice and
3  pursuant to the Federal Rules and the local
4  rules of the Southern District of Illinois and
5  also as Mr. Hendrickson said is taken pursuant
6  to the diversity jurisdiction dispute between
7  the parties.
8      Q:  (By Mr. Relihan)  Sir, what is your
9  current address?
10     A:  3152 Boonslick Road, St. Charles, and
11  I'm not sure on the zip code.
12     Q:  Okay.  How long have you lived there,
13  sir?
14     A:  Approximately a month, or a little bit
15  less than a month.
16     Q:  Okay.  I'm going to show you what
17  we've previously marked as Exhibit 1.  Sir, if
18  you could turn to the, I believe it's the
19  second to last page, it's the signature page.
20  Sir, is your signature on that document?
21     A:  Yes, sir.
22     Q:  Okay.  And for the record, these are
23  Plaintiff's Answers to Defendant's John
24  Petrovich, MD's Diversity Jurisdiction
25  Interrogatories.  Sir, have you ever seen that

1  document before?
2      A:  Yes, sir.
3      Q:  Okay.  Did you review that document
4  before you signed it?
5      A:  Yes, I did.
6      Q:  Are all the answers in there truthful
7  and accurate?
8      A:  They are.
9      Q:  I'm going to show you Defendant's
10  Exhibit 2, which is Plaintiff's Responses to
11  Defendant John A. Petrovich, MD's Diversity
12  Jurisdictional Request to Produce.  Can you
13  turn to the last page, sir?  Is that your
14  signature?
15     A:  Yes, sir.
16     Q:  Have you seen this document before?
17     A:  Yes.
18     Q:  Did you review it?
19     A:  Yes, I did.
20     Q:  Are all the answers accurate?
21     A:  Yes, they are.
22     Q:  And just for the record, today counsel
23  provided what we'll mark as Exhibit 5, Amended
24  Supplemental Responses to the Jurisdictional
25  Request to Produce and the only addition is a

1  copy of a blank check of Donald W. Canterbery
2  from Bank of America.  Sir, when did you give
3  that document to your attorney, that blank
4  check?
5      (Defendant's Deposition Exhibit 5 marked for
6            identification)
7      A:  This morning.
8      Q:  Okay.  Do you live with anyone at your
9  3152 Boonslick Road?
10     A:  No, I don't, I live alone.
11     Q:  Is that a house, an apartment?
12     A:  Duplex.
13     Q:  You rent that?
14     A:  Yes, I do.
15     Q:  And for lack of a better term, you
16  want to call it a duplex?
17     A:  Yes.
18     Q:  Does someone share the other portion
19  of the, the portion of the duplex?
20     A:  My land lady has the other half.
21     Q:  And your land lady is Sharon Kimball?
22     A:  Correct.
23     Q:  How long have you known Ms. Kimball?
24     A:  Since a couple days before I rented
25  it.

1      Q:  How did you meet her?
2      A:  Through my cousin. -- no, no, can I
3  rephrase that?
4      Q:  Sure.
5      A:  I found the ad in the laundry mat, I
6  was doing laundry and found that.
7      Q:  Okay.  And I forgot to ask you this
8  earlier; have you ever given a deposition
9  before, sir?
10     A:  No, I haven't.
11     Q:  Okay.  Let me go over some ground
12  rules.  Obviously we have a Court Reporter
13  here, everything needs to be oral, I'm sure
14  your attorney went over this, nods of the head,
15  shakes of the head do not come across well.  I
16  will try not to talk over you and try not to
17  talk over me, although we may know exactly what
18  we're getting at.
19     A:  Okay.
20     Q:  And if you answer any of my questions,
21  I'll assume that you understood that, is that
22  fair?
23     A:  Yes, sir.
24     Q:  And if you don't understand it, or
25  need me to repeat it, just let me know.

## Page 10

1   A:  Okay.

2   Q:  And if you need to take a break at any

3  time, just let me know, okay?

4   A:  Okay.

5   Q:  Okay.  Did you sign a written lease

6  for this duplex?

7   A:  No, I didn't.

8   Q:  This is a month to month lease?

9   A:  Correct.

10   Q:  Is it an oral lease?

11   A:  Yes, sir.

12   Q:  Can you describe for me how this lease

13  was formed?  What did you say to her, how did

14  you come to an agreement that it was a month to

15  month lease?

16   A:  *She said that she prefers not to have*

17  *a long-term lease, that she would rather go*

18  *month to month, that way either one of us can*

19  *get out of it without any penalties.*

20   Q:  Did she ever ask you to sign a written

21  lease?

22   A:  No, she didn't.

23   Q:  Okay.  You state in your

24  Interrogatories that you moved in on October

25  27th, 2006, does that sound accurate?

## Page 11

1   A:  That would be pretty close.

2   Q:  Okay.

3   A:  I don't remember dates well, excuse

4  me.

5   Q:  Okay.  So it's been about 17, 18 days

6  you've been at that duplex?

7   A:  About that.

8   Q:  What do you pay?

9   A:  250 a month.

10   Q:  Okay.  Obviously your first payment is

11  coming up?

12   A:  This next month.

13   Q:  Yes.  Have you made a payment yet?

14   A:  Yes.

15   Q:  How did you make that first payment,

16  by check, by cash?

17   A:  Cash.

18   Q:  Did your land lady say that she wants

19  cash?

20   A:  She prefers cash, she will take a

21  check if I have to.

22   Q:  Okay.  What day of the month is your

23  rent due?

24   A:  A month from the day I moved in, was

25  that the 17th?

## Page 12

1   Q:  27th according to your

2  Interrogatories.

3   A:  27th.

4   Q:  Okay.  Do you intend to remain at this

5  residence permanently?

6   A:  Yes, I do.

7   Q:  Do you remember what day you saw that

8  ad in the laundry mat?

9   A:  Not right off, it was two or three

10  days before I got the duplex, that would have

11  made it the 23rd or the 24th.

12   Q:  So, it's your best recollection that

13  you found the ad on October 23rd or October

14  24th and moved in approximately three to four

15  days thereafter?

16   A:  Correct.

17   Q:  Is it fair to state that you did not

18  find that laundry mat ad before October 13th,

19  2006?

20   A:  Oh, no.

21   Q:  Okay.  Have you informed anyone other

22  than your attorney of your new address?

23   A:  No.

24   Q:  Have you informed your family or

25  friends?

## Page 13

1   A:  My dad knows where I'm at, but he's

2  down in Texas and didn't really need the

3  address.

4   Q:  Okay.  Now, you stated in your

5  Interrogatories that you stayed with various

6  friends and family over the past six months.

7  Did you inform those friends and family of your

8  new address?

9   A:  No.

10   Q:  Your Answers to Interrogatories you

11  gave a list of where you've been living since

12  April of '06, and according to your

13  Interrogatories, the first time you moved in to

14  Missouri was the 14 Ridgeview Court, St.

15  Charles, Missouri?

16   A:  Correct.

17   Q:  You moved there approximately August

18  15, 2006?

19   A:  Yes.

20   Q:  Is that correct?

21   A:  Yes, sir.

22   Q:  Is that the first time you've ever

23  lived in Missouri?

24   A:  Yes, it is

25   Q:  Okay.  Is it fair to say that prior to

15

```
 1   that address, you've never had any residence,
 2   temporary or otherwise, in Missouri?
 3       A:   Correct.
 4       Q:   That was a temporary address?
 5       A:   I'm sorry?
 6       Q:   And then St. Charles, Missouri at the
 7   14 Ridgeview Court, that was a temporary
 8   address?
 9       A:   Yes, it was.
10       Q:   Prior to living at Boonslick Road, you
11   lived at 817 Randolph in Elsberry, Missouri?
12       A:   Correct.
13       Q:   How long did you live there?
14       A:   Approximately three weeks.
15       Q:   Why did you move?
16       A:   It didn't work out.
17       Q:   When you say it did not work out, what
18   do you mean?
19       A:   I believe it was personality clash
20   between me and Leah.
21       Q:   And you say Leah, that would be Leah
22   Fennell the landlord?
23       A:   Leah Fennell.
24       Q:   Okay.  Do you know what date you moved
25   in?
```

```
 1       A:   I'm not good with dates.
 2       Q:   Okay.  You state in your
 3   Interrogatories that you moved in approximately
 4   October 3rd, 2006, does that sound correct?
 5       A:   That, that's a lot closer to what I
 6   could have come up with off the top of my head.
 7       Q:   Okay.  And you lived at that residence
 8   until October 27th when you moved into the
 9   Boonslick Road address?
10       A:   Correct.
11       Q:   Okay.  Did you live with anyone at
12   that address?
13       A:   At the 817.
14       Q:   At the 817 address.
15       A:   The land lady was staying there, I was
16   sharing the house with her.
17       Q:   Leah Fennell was a woman?
18       A:   Yes.
19       Q:   Okay.  Was that an apartment, house?
20       A:   It's a house.
21       Q:   Okay.  Just for a second, going back
22   to your Boonslick Road address, do you have a
23   phone service set up?
24       A:   No, I've got a cell phone.
25       Q:   How long have you had a cell phone?
```

16

```
 1       A:   About two or three months.
 2       Q:   Where did you, what service do you
 3   have for that cell?
 4       A:   Cingular, it's prepaid though.
 5       Q:   What do you mean it's prepaid?
 6       A:   I get a card at a Wal-Mart or a
 7   Cingular store and put time on my phone.
 8       Q:   Do you punch in a code, is that how
 9   the phone recognizes you have time?
10       A:   Uh-huh.
11       Q:   Yes?
12       A:   Yes.
13       Q:   Have you received any statement from
14   Cingular regarding your phone?
15       A:   No.
16       Q:   Okay.  When you purchased the cell
17   phone, did you, what store did you go to?
18   Where did you purchase it from?
19       A:   I already had the phone.  I purchased
20   the service from Wal-Mart.
21       Q:   Where is that Wal-Mart located?
22       A:   St. Charles.
23       Q:   St. Charles, Missouri?
24       A:   Correct.
25       Q:   Is that approximately two or three
```

17

```
 1   months ago, that would be sometime in August or
 2   September of '06?
 3       A:   Yes.
 4       Q:   You say you already had the phone,
 5   what do you mean by that?
 6       A:   Me and my fiance, before she passed
 7   away, had regular Cingular service, and I found
 8   out that the prepaid chips would work in there.
 9       Q:   What was your fiance's name?
10       A:   Gretchen R. Dayment, D-A-Y-M-E-N-T.
11       Q:   And you two had a Cingular Wireless
12   account?
13       A:   Yes, sir.
14       Q:   Okay.  That Cingular Wireless account,
15   when did you open that account, you and your
16   fiance?
17       A:   Probably around July of '05.
18       Q:   Where were you living in July of '05?
19       A:   In Granite City, Illinois.
20       Q:   When did you move from Granite City,
21   Illinois?
22       A:   Three weeks after my fiance passed
23   away, she died April 5th and the end of the
24   month I moved to Texas.
25       Q:   April 5th of '06?
```

1   A:   Yes.

2   Q:   And that's where in the past six

3   months you've gone from address to address to

4   address until this now permanent address at

5   Boonslick Road?

6   A:   Correct.

7   Q:   Okay.  Is it fair to say that when you

8   lived in Granite City with your fiance, that

9   was your permanent address until the

10  unfortunate events of your fiance's passing?

11  A:   Yes.

12  Q:   How long did you live in Granite City?

13  A:   Six years.

14  Q:   While you lived in Granite City for

15  those six years, that would have been from

16  about 2000 until April of 2006?

17  A:   Yes.

18  Q:   Did you guys own -- sorry.  Did you

19  and your fiance own or rent a home?

20  A:   Rent.

21  Q:   Do you remember the address?

22  A:   3901 Village Lane, Apartment C.

23  Q:   Did you and your fiance live in that

24  apartment for six years?

25  A:   Almost, we got a duplex six months

---

1   before she died or five months before she died.

2   Q:   Where was that duplex located?

3   A:   3102 Wilshire.

4   Q:   What city is that?

5   A:   Granite City.

6   Q:   So you still stayed in Illinois?

7   A:   I'm sorry.

8   Q:   You still stayed in Illinois?

9   A:   Yes.

10  Q:   Okay.  And as long as your fiance was

11  alive, you two had plans to permanently stay in

12  Illinois and reside there, correct?

13  MR. HENDRICKSON:  Objection, his

14  intent prior to the filing of this suit and

15  prior to the removal is irrelevant.  You can go

16  ahead and answer.

17  A:   Would you restate the question?

18  Q:   (By Mr. Relihan)  Sure.  Prior to your

19  fiance's death, you and her intended to remain

20  permanently in Illinois, in and around the

21  Granite City, Illinois area?

22  A:   Yes.

23  Q:   Okay.  Is it fair to state that from

24  April 5th, 2006 until October 27th, 2006 when

25  you moved into the Boonslick Road address, that

---

1   you did not have any permanent residence?

2   A:   That's true.

3   Q:   Moving back to the 817 Randolph,

4   Elsberry, Missouri address, in your Answers you

5   said you met Ms. Fennell through your cousin?

6   A:   Correct.

7   Q:   What's your cousin's name?

8   A:   Billy Fennell.

9   Q:   Was Leah his sister?

10  A:   His exwife.

11  Q:   Okay.  How long had you known Leah

12  Fennell?

13  A:   About a month and a half.

14  Q:   You paid $300 per month while you were

15  at that address?

16  A:   Yes.

17  Q:   Did you pay that up front?

18  A:   Yes, sir, I did.

19  Q:   Did you pay that in cash?

20  A:   Yes, I did.

21  Q:   Did you sign any lease?

22  A:   No, I didn't.

23  Q:   When you lived at the Granite City

24  apartment, 3901 Village Lane, did you sign a

25  written lease for that?

---

1   A:   I didn't, my fiance had that apartment

2   when I moved to Granite City.

3   Q:   Do you know if she signed a written

4   lease?

5   A:   Yes, she did.

6   Q:   Where did you live prior to moving in

7   with your fiance at the Village Lane apartment?

8   MR. HENDRICKSON:  Objection,

9   irrelevant, too remote in time.  You can go

10  ahead and answer.

11  WITNESS:  Okay.

12  A:   Mainly in motels, I was with the

13  railroad, contracted with the railroad and

14  moved all over the country.

15  Q:   (By Mr. Relihan)  When you and your

16  fiance moved into the duplex at 3102 Wilshire,

17  did you and your fiance sign a lease?

18  A:   Yes.

19  Q:   How long was that lease for?

20  A:   Six months.

21  Q:   When you moved from the Wilshire

22  apartment to Texas, had that lease expired at

23  the Wilshire duplex?

24  A:   It would in another three or four days

25  from the time I moved.

22

1    Q:   Okay.  So you've seen a written lease
2    for an apartment and know what one is?
3    A:   Yes.
4    Q:   Okay.  At the 817 Randolph address,
5    did you intend to remain there permanently when
6    you moved there?
7    A:   Yes.
8    Q:   However did you not remain there
9    permanently?
10   A:   No.
11   Q:   When did the trouble with Ms. Fennell
12   start?  When did you guys start having issues
13   when you moved in?
14   A:   Probably the first, it happened within
15   the first three or four days.
16   Q:   At that point, did you know you had to
17   find another place to live?
18   A:   No, I thought I'd work through it.
19   Q:   Do you remember what day it became,
20   got to the point where you knew you couldn't
21   work through it?
22   A:   It had to have been around the 20th or
23   21st.
24   Q:   I'm going to show you what's a part
25   of, what's been marked as Exhibit 3,

23

1    Plaintiff's Motion to Remand of Donald
2    Canterbery, have you seen that before, sir?
3    A:   Yes, I have.
4    Q:   Is that your signature on the second
5    page of that affidavit?
6    A:   Yes.
7    Q:   Did you review that affidavit prior to
8    signing it?
9    A:   Yes, I did.
10   Q:   Are those truthful statements in that
11   affidavit?
12   A:   Yes, they are.
13   Q:   Okay.  Turning to Paragraph 3, as of
14   September 13th, 2006, you were temporarily
15   residing in St. Charles, Missouri?
16   A:   Correct.
17   Q:   Okay.  That wasn't your permanent
18   address?
19   A:   Muh-uh.
20   Q:   That wasn't your permanent address?
21   A:   No.
22   Q:   You had no intention for that to be
23   your permanent address?
24   A:   No.
25   Q:   Okay.  Is it fair to say in the six

24

1    months prior to today's dates, since the death
2    of your fiance, you have not had any permanent
3    residences other than the one at Boonslick
4    Road?
5    A:   Correct.
6    Q:   Okay.
7    MR. HENDRICKSON:  I'll object, I think
8    he already said that he intended at the time
9    for it to be a permanent residence at 817
10   Randolph.  Is that true?
11   WITNESS:  That's true.
12   Q:   (By Mr. Relihan)  You stated in
13   Paragraph 6 that you entered into a long-term
14   lease concerning the property, is that true?
15   A:   Yes, sir.
16   Q:   Okay.  Is that an oral or written
17   lease?
18   A:   Oral.
19   Q:   How long of a term for that lease?
20   A:   One year.
21   Q:   Do you have any proof of that oral
22   agreement?
23   A:   Just my word.
24   Q:   And you were to pay $300 a month?
25   A:   Yes.

25

1    Q:   Do you have any statements or letters
2    or anything in writing to document that
3    long-term lease?
4    A:   No, I don't.
5    Q:   Okay.  And you state in Paragraph 5
6    that you had no permanent residences in
7    Illinois and Texas from April 2006 to today's
8    date?
9    A:   Correct.
10   Q:   But prior to April 2006 you had a
11   permanent residence in Illinois, correct?
12   A:   Correct.
13   Q:   Okay.  And you intended to live there
14   permanently with your fiance?
15   A:   Yes.
16   MR. HENDRICKSON:  Objection.
17   Correction intended at what point; in April of
18   2006?
19   MR. RELIHAN:  Yes.
20   Q:   (By Mr. Relihan)  Prior to the death
21   of your fiance, you intended to remain
22   permanently in Illinois?
23   A:   Yes.
24   Q:   Okay.  And prior to the Boonslick Road
25   address, you have not had a permanent address?

26

```
1    A:  Other than 817 Randolph.
2    Q:  Well, that wasn't a permanent
3  residence, was it?
4        MR. HENDRICKSON:  The question is one
5  of intent.
6    Q:  (By Mr. Relihan)  My question was;
7  that was not a permanent residence?
8    A:  It would have been if everything had
9  worked out right.
10   Q:  I understand.  But that was not a
11 permanent residence, correct?
12   A:  Well, yes, I thought it was.
13   Q:  I understand what you thought it was.
14       MR. HENDRICKSON:  Objection, asked and
15 answered.
16       MR. RELIHAN:  It has not been
17 answered.  His thoughts are irrelevant.  My
18 question is simple.
19   Q:  (By Mr. Relihan)  That was not a
20 permanent address for you?
21   A:  Yes, it was.
22       MR. HENDRICKSON:  No address --
23 objection, objection.  You're repeatedly asking
24 the same question, he's answered it to the best
25 of his ability.  You're asking about
```

27

```
1  permanency, permanency is a matter of intent,
2  he has answered you as to his intent at the
3  time he took up residence there.
4        MR. RELIHAN:  Counsel, as you know
5  speaking objections are not allowed.  My
6  question is simple.
7    Q:  (By Mr. Relihan)  Looking back and as
8  that address, intent aside, that did not remain
9  a permanent address?
10       MR. HENDRICKSON:  Objection, improper
11 question.  Don't answer.  I'm going to instruct
12 you not to answer, it's already been asked and
13 answered about five times.
14   Q:  (By Mr. Relihan)  Sir, do you
15 understand my question?
16   A:  Yes.
17   Q:  Are you going to answer my question?
18       MR. HENDRICKSON:  No.
19   A:  No.
20   Q:  (By Mr. Relihan)  Are you not
21 answering that question on the advice of your
22 counsel?
23   A:  Yes.
24       MR. RELIHAN:  Would you certify that
25 question, please.
```

28

```
1        COURT REPORTER:  Yes.
2    Q:  (By Mr. Relihan)  You had a year lease
3  at that Elsberry address, correct?
4    A:  Correct.
5    Q:  And that was an oral lease, correct?
6    A:  Correct.
7    Q:  You did not stay at that residence for
8  that full year that you had an oral lease for,
9  correct?
10   A:  That's correct.
11   Q:  Okay.  Did you pay a security deposit?
12   A:  Yes, I did.
13   Q:  Okay.  How much was that security
14 deposit?
15   A:  $500.
16   Q:  Did you receive that security deposit
17 back?
18   A:  Yes, I did.
19   Q:  Did you receive any of the $300 you
20 paid initially back?
21   A:  No.
22   Q:  Did you pay any penalty for breaking
23 the oral lease?
24   A:  No.
25   Q:  Okay.  Looking at the affidavit, who
```

29

```
1  drafted that affidavit, sir?
2        MR. HENDRICKSON:  I'll stipulate that
3  I did.
4        MR. RELIHAN:  Okay.
5    Q:  (By Mr. Relihan)  When you signed that
6  affidavit, did you receive both pages?
7    A:  Yes, I did.
8    Q:  And when you signed it, did you sign
9  it in the presence of your attorney?
10   A:  Yes, I did.
11   Q:  Okay.  And you signed it on October
12 20th, 2006?
13   A:  Yes.
14   Q:  Okay.  Isn't it true that on October
15 20th, 2006, you were aware that it was not
16 going to work out, that you were going to stay
17 at the Elsberry address?
18   A:  I'm sorry?
19   Q:  Okay.  You testified earlier that on
20 approximately October 20th, 2006, you realized
21 it was not going to work out at the Elsberry
22 address?
23   A:  Right.
24   Q:  And on that date you signed an
25 affidavit stating and testifying that you
```

30

1   intended to remain at the Elsberry address
2   permanently, correct?
3   MR. HENDRICKSON:  Are you sure on the
4   dates?
5   MR. RELIHAN:  Counsel --
6   A:  I'm not positive on the dates of when
7   that happened.
8   Q:  (By Mr. Relihan)  Okay.  But if we
9   take your prior testimony as being October
10   20th, 2006, if that was the date that you were
11   aware that you were not going to stay at the
12   Elsberry address, would your affidavit then be
13   correct?
14   A:  Yes.
15   Q:  Okay.  So it would be correct that you
16   intended to remain permanently at an address
17   that you knew on that date -- strike the
18   question.  So on October 20th, 2006, we assume
19   for this question that you knew you were not
20   going to stay at the Elsberry address.
21   MR. HENDRICKSON:  Objection, improper
22   hypothetical.  You're asking him to assume
23   facts that are not in evidence.
24   MR. RELIHAN:  Well, unfortunately
25   counsel, he's testified that October 20th, 2006

31

1   might have been the day that he realized --
2   MR. HENDRICKSON:  Might have been.
3   Why don't you ask him again if it was the day.
4   MR. RELIHAN:  That was to the best of
5   his recollection, that's how he answered the
6   question.
7   Q:  (By Mr. Relihan)  Now I'm asking a
8   hypothetical; that if on October 20th, 2006,
9   you knew you were not going to remain at the
10   Elsberry address, that it had become too
11   difficult, would it, in fact, then be signing
12   that affidavit on that day make that affidavit
13   incorrect?
14   MR. HENDRICKSON:  Assuming all of the
15   facts that you've just stated whether they're
16   true or not?
17   MR. RELIHAN:  The question is simple
18   and if he understands the question, he can
19   answer it.
20   MR. HENDRICKSON:  Do you understand
21   the question?
22   WITNESS:  I really don't.
23   Q:  (By Mr. Relihan)  Okay, I'll repeat
24   it.  Assume for a fact that on October 20th,
25   2006 you knew you were not going to remain at

32

1   the Elsberry address, okay?
2   A:  (Witness nods)
3   Q:  Can you assume that?
4   A:  I can assume that.
5   Q:  Okay.  Now we know by signing that
6   affidavit, you signed it on October 20th, 2006,
7   correct?
8   A:  Correct.
9   Q:  That is true, that is in writing,
10   correct?
11   A:  This part is true, but I'm not certain
12   --
13   Q:  I understand.  I just want you to go
14   and I'm trying to establish my hypothetical so
15   you understand it.  If we assume that on
16   October 20th, 2006, you knew you were not going
17   to stay at the Elsberry address, but on October
18   20th, 2006 you signed an affidavit asserting
19   and testifying that you were going to remain at
20   that Elsberry address permanently, would that
21   make your affidavit incorrect?
22   MR. HENDRICKSON:  Objection, improper
23   hypothetical, assumes facts not in evidence.
24   You're asking him to assume facts that he
25   hasn't testified to, otherwise you can answer

33

1   it, if you can.
2   A:  I don't think that I signed this prior
3   to me moving out, I know it was a Wednesday
4   morning when I moved out, but I had thoughts
5   that we might patch things up, and I could go
6   back up there and that didn't happen.
7   Q:  (By Mr. Relihan)  All right, sir.
8   That's not answering my question.  I'll
9   establish the hypothetical again and we'll go
10   through this.
11   MR. HENDRICKSON:  Can I have a running
12   objection.
13   MR. RELIHAN:  Sure.
14   Q:  (By Mr. Relihan)  Assuming again that
15   on October 20th, 2006, you knew you was not
16   going to work out at the Elsberry address,
17   okay?
18   A:  Okay.
19   Q:  Assume that, we know on October 20th,
20   2006, you signed an affidavit stating that the
21   Elsberry address was going to be your permanent
22   address, correct?
23   A:  Correct.
24   Q:  If those two facts are true, would it
25   then make your affidavit incorrect?

34

1 A: I don't know how to answer that.

2 Q: It's a simple yes or no answer.

3 MR. HENDRICKSON: Actually there's

4 nothing simple about that question considering

5 it's an improper hypothetical.

6 Q: (By Mr. Relihan) Sir, would -- if

7 those two facts are true, that on October 20th,

8 2006, we're assuming this fact, that you knew

9 you were not going to remain at the Elsberry

10 address, and on that same day, October 20th,

11 2006, which is in writing, you signed an

12 affidavit stating you intended to remain with a

13 long-term lease at the Elsberry address, if

14 those two facts are true, would it then make

15 your affidavit incorrect?

16 A: If those two facts are true, yes.

17 Q: Okay. When you lived at the 817 --

18 strike that question. You testified earlier

19 that the 14 Ridgeview Court in St. Charles,

20 Missouri was a temporary address?

21 A: Yes.

22 Q: You did not intend that to be your

23 permanent address?

24 A: No, I didn't.

25 Q: Who were you staying with?

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750   St. Charles 636.940.0926*

35

1 A: My cousin.

2 Q: Okay. What was your cousin's name?

3 A: Billy Fennell.

4 Q: Did he live in St. Charles?

5 A: Correct.

6 Q: You were just staying there until you

7 found something --

8 A: Yes.

9 Q: -- a place to stay?

10 A: Yes.

11 Q: Prior to that, you lived at 62 Mallard

12 Drive in Pontoon Beach, Illinois?

13 A: Yes.

14 Q: You stayed there for approximately two

15 months?

16 A: Six weeks to two months, something

17 like that.

18 Q: Were you staying with anyone?

19 A: Yes.

20 Q: Who were you staying with?

21 A: Alan Shepherd and Patty Branch.

22 Q: Are they relatives of yours?

23 A: No.

24 Q: Are they friends of yours?

25 A: Yes.

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750   St. Charles 636.940.0926*

36

1 Q: This again was a temporary address?

2 A: Yes, it was.

3 Q: Why did you move from the Pontoon

4 Beach to your cousin's house in St. Charles,

5 Missouri?

6 A: How do I answer that? My cousin felt

7 like people over in Granite City was trying to

8 use me and he wanted to get me away from there.

9 Q: So, on your cousin's advice, you moved

10 in with him?

11 A: Yes.

12 Q: He offered his residence?

13 A: Yes.

14 Q: Prior to his offer, you had no

15 intention of going to live with your cousin?

16 A: No.

17 Q: You intended to stay with your friends

18 Alan Shephard and Patty Branch until you found

19 something else?

20 A: Correct.

21 Q: Did you have an agreement that you

22 were going to stay a year, a couple months or

23 however long you needed?

24 A: Just short-term.

25 Q: Okay. Was Alan Shephard and Patty

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750   St. Charles 636.940.0926*

37

1 Branch using you?

2 A: I don't think so.

3 Q: If you didn't think they were using

4 you, but your cousins did, why did you go ahead

5 and move in with your cousin?

6 A: Because he's family.

7 Q: So the sole, or the decision to move

8 in with your cousin was based on his offer and

9 that he's family?

10 A: Correct.

11 Q: Okay. Were there any other reasons

12 for moving in with your cousin in St. Charles,

13 Missouri?

14 A: No.

15 Q: Prior to that, you lived at 5445

16 Maryville Road in Granite City, Illinois?

17 A: Right.

18 Q: Who did you live there with?

19 A: A friend of mine, Peggy Zigan.

20 Q: Do you know how to spell her last

21 name?

22 A: Z-I-G-A-N.

23 Q: She's a friend of yours?

24 A: Yes.

25 Q: How long did you live there?

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750   St. Charles 636.940.0926*

38

1      A:   Probably right around a month, right

2   around a month.

3      Q:   Why did you move?

4      A:   Patty and Alan offered me, I was

5   sleeping on the couch at Peggy's and they

6   offered me a bed.

7      Q:   Better sleeping arrangements, so you

8   took it?

9      A:   Yes.

10     Q:   Were you paying any rent when you were

11  living at the Maryville Road address?

12     A:   No.

13     Q:   Did you pay any rent to Patty or Alan?

14     A:   No.

15     Q:   Prior to that, you lived at 8321 North

16  Loop in El Paso, Texas?

17     A:   Right.

18     Q:   You lived with your father?

19     A:   Yes.

20     Q:   You were there for about a month?

21     A:   Yes, sir.

22     Q:   Do you know what date you moved there?

23     A:   I think we pulled into town May 5th.

24     Q:   Okay.  And this was after the death of

25  your fiance?

39

1      A:   Correct.

2      Q:   Did you pay any rent?

3      A:   It wasn't really rent, I helped him

4   out with expenses.

5      Q:   What expenses did you help him out

6   with?

7      A:   Food, electric.

8      Q:   Why did you move from El Paso to

9   Granite City, Illinois?

10     A:   Because the memories I ran away from I

11  decided I needed to come back up.

12     Q:   Did you have, when you decided to

13  leave El Paso, Texas, did you have a place to

14  stay in Illinois?

15     A:   Yes.

16     Q:   Okay.  And that was?

17     A:   Peggy Zigan.

18     Q:   Okay.  And prior to the El Paso, Texas

19  address, you lived at the 3301 Wilshire?

20     A:   Correct.

21     Q:   That's a duplex --

22     A:   Yes.

23     Q:   -- that you and your fiance signed a

24  lease for?

25     A:   Yes.

40

1      Q:   Do you remember the landlord?

2      A:   I remember his first name is Dave, I

3   don't remember what his last name is.

4      Q:   And you found this in the newspaper?

5      A:   Correct.

6      Q:   You paid $575 a month?

7      A:   Yes, sir.

8      Q:   Do you have a copy of that lease

9   still?

10     A:   No, I don't.

11     Q:   In your complaint, the date of the

12  alleged negligence is September 27, 2004, where

13  were you living at that time?

14     A:   3301 Village Lane, Apartment C.

15     Q:   That was that five year span at that,

16  at your fiance's apartment?

17     A:   Correct.

18     Q:   That you and her shared together after

19  you moved in?

20     A:   Yes.

21     Q:   At that Wilshire address, were any

22  bills in your name?

23     A:   No, they weren't.

24     Q:   Were all utilities in her name?

25     A:   Yes, they were.

41

1      Q:   The Cingular account you had with your

2   fiance, was that in her name or your name?

3      A:   Her name.

4      Q:   Although no bills were in your name,

5   the utilities that -- or strike that.  The

6   utilities that were, that you had to pay for at

7   that apartment, did you contribute to pay for

8   those utilities?

9      A:   Yes, I did.

10     Q:   The utilities that you did receive,

11  did they go to that Wilshire address, were they

12  sent to that address?

13     A:   Yes.

14     Q:   Okay.

15          MR. HENDRICKSON:  You mean the bills?

16          MR. RELIHAN:  Yes, the utility bills.

17  Sorry.

18     Q:   (By Mr. Relihan)  Did you and your

19  fiance have a joint checking account?

20     A:   No, we didn't.

21     Q:   Did you each have separate checking

22  accounts?

23     A:   No.

24     Q:   Did she have a checking account?

25     A:   Yes, she did.

43

```
 1      Q:   You had no checking account?
 2      A:   No, I didn't.
 3      Q:   Prior to the injury in this case, were
 4  you earning any income?
 5      A:   Yes, I was.
 6      Q:   Did you deposit, were you paid by cash
 7  or check?
 8      A:   Check.
 9      Q:   Okay.  When you received a check from
10  your employer, who was your employer at that
11  time, if you can remember?
12      A:   It's Aerospace something, it was a
13  temp employer.
14      Q:   Where are they located?
15      MR. HENDRICKSON:  I'm going to object.
16  We're getting pretty far afield of citizenship
17  and residency.
18      MR. RELIHAN:  I'm trying to wrap it
19  up.  I understand.
20      MR. HENDRICKSON:  All right.
21      Q:   (By Mr. Relihan)  Do you know where
22  they're located?
23      A:   In St. Louis.
24      Q:   Okay.  Was there an office in St.
25  Louis you went to or was there an office in
```

```
 1  Illinois?
 2      A:   No, the office was in St. Louis.
 3      Q:   When you get a check from this
 4  employer, would you then sign it over and your
 5  wife would deposit it in that account?
 6      A:   Yes.
 7      Q:   Okay.  Did you ever want to put your
 8  name on that checking account?
 9      A:   No.
10      Q:   Are you currently registered to vote?
11      A:   No. I'm not.
12      Q:   You state in your Interrogatories you
13  last registered to vote in Texas in 1980?
14      A:   Yes.
15      Q:   Are you still registered there?
16      A:   No.
17      Q:   Have you gone in and unregistered
18  yourself in Texas?
19      A:   No.
20      Q:   Okay.  Have you registered in any
21  other state to vote?
22      A:   No, I'm not.
23      Q:   Have you attempted to register to vote
24  in Missouri?
25      A:   No.
```

44

```
 1      Q:   Now, according to your affidavit, it
 2  states that you attempted to establish
 3  permanent domicile on October 4th, 2006, which
 4  was more than 30 days prior to this November's
 5  election, correct?
 6      A:   Yes.
 7      Q:   Did you have no desire to vote in this
 8  election?
 9      A:   That's right.
10      Q:   Therefore, you never registered to
11  vote in Missouri?
12      A:   Correct.
13      Q:   Do you currently have a Bank of
14  America account?
15      A:   Yes.
16      Q:   All right.  I'm going to show you your
17  supplemental response to Request to Produce,
18  and I ask you to turn to the back page, is that
19  a copy of the blank check?
20      A:   Yes.
21      Q:   Okay.  And when you applied for this
22  account, you gave the St. Charles address?
23      A:   Yes.
24      Q:   Okay.  Before we go any further, do
25  you have a driver's license?
```

45

```
 1      A:   No, I don't.
 2      Q:   Do you have a state ID?
 3      A:   Yes, I do.
 4      Q:   May I see it?  And you can show it to
 5  your counsel first.
 6      A:   Okay.
 7      Q:   For the record, I'm looking at an
 8  Illinois ID card No. 53619952171C, issued on
 9  9/9/'03, expiring 6/16/'09, with an address of
10  Donald W. Canterbery at 3901 Village Lane,
11  Apartment C, Granite City, Illinois 62040.
12  Sir, prior to this past six months of moving to
13  temporary addresses, how long had you been in
14  Illinois?
15      A:   Since 2000.
16      Q:   Okay.
17      A:   August of 2000.
18      Q:   And you applied for and were issued an
19  Illinois ID card, correct?
20      A:   (Witness nods)
21      Q:   Correct?
22      A:   Correct.
23      Q:   Now, it says that that one was issued
24  on 9/9/'03, did you have a prior ID card prior
25  to that?
```

47

A: No, I didn't.

Q: Okay. What did you use when you went to apply for this ID card, what forms of information did you give the Secretary of State?

MR. HENDRICKSON: I'm going to object, again this is irrelevant. We're talking about September '03, it's well before any of the events of this case and it's certainly before any relevant dates to the Motion to Remand. You can go ahead and answer.

A: My mother was alive at that time and she sent me my birth certificate.

Q: (By Mr. Relihan) At that time did you have any driver's license or ID cards from any other state?

A: No.

Q: Is it fair to say that when you applied -- that's only a checking account, correct?

A: Correct.

Q: When you applied for the checking account, you showed them your Illinois ID?

A: Yes.

Q: Okay. How long have you had this

checking account?

A: Since 9 of '06.

Q: Okay. And since September of '06, you have not received any bank statements?

A: No, I haven't.

Q: Have you requested to receive bank statements?

A: No, I haven't had any money to put in there yet.

Q: Well, even without any money, they have not sent you "you have a checking account with a zero balance", you have not made any transaction?

A: I haven't received anything yet.

Q: Have you called to ask them "are you going to send me any bank statements"?

A: No.

Q: Okay. Do you check your account online or anything?

A: No, I don't, not yet.

Q: When did you receive your checks?

A: 9/'06, I guess.

Q: Prior to this Bank of America checking account, did you have any checking accounts?

A: No.

48

Q: After your fiance died and there was this six months, almost five months without, before you opened up this account, where did you keep your money?

A: In my pocket.

Q: Okay. All cash?

A: Yes.

Q: Okay. You do not belong to any memberships or clubs?

A: No, I don't.

Q: Okay. Have you applied to any in Missouri?

A: Nope.

Q: When you lived at the Elsberry address, did you apply to any clubs?

A: No.

Q: Are you currently employed?

A: No, I'm not.

Q: When was the last time you were employed?

A: June of '04.

Q: Was that through Areospace?

A: Correct.

Q: Have you applied for any jobs in Missouri?

49

A: No.

Q: Have you applied for any jobs anywhere else?

A: No, I haven't.

Q: Is it fair to say then in the past six months since April of 2006, you haven't applied for any jobs?

A: That's correct.

Q: Are you on any disability, sir?

A: Yes, I am.

Q: Okay. Is that how you afford to pay your rent?

A: Correct.

Q: Okay. Do you receive a check every month?

A: Yes.

Q: When did you start receiving those checks?

A: I believe in February, this year.

Q: And so in February you would send them over to your fiance and she would deposit them in the checking account?

A: Yes.

Q: After her death, you would receive a check, you would endorse it and then go to a

51

```
1    credit union, bank, some form and get straight
2    cash from it?
3         A:   Actually I have a, I have a cash pay
4    credit card that Social Security direct
5    deposits in there and it's like an ATM card,
6    but it's, that's all I've got.
7         Q:   So, it's fair to state that instead of
8    receiving an actual check, Social Security puts
9    it directly into this account which is linked
10   to this credit card and you use it as an ATM
11   card?
12        A:   Correct.
13        Q:   When did you receive that card?
14        A:   When I worked for Aerospace, they set
15   it up so I could get my pay through there.
16        Q:   So Aerospace set up this account that
17   is now linked to your Social Security
18   disability benefits?
19        A:   Correct.
20        Q:   Okay.  I'm assuming since you've not
21   applied for any jobs, you don't have any resume
22   that you've sent out or anything?
23        A:   No.
24        Q:   That's correct?
25        A:   That's correct.
```

52

```
1         Q:   When did you buy that truck?
2         A:   The 4th of last month.
3         Q:   October 4th?
4         A:   Yes.
5         Q:   What dealership?
6         A:   Cars Unlimited, St. Charles.
7         Q:   Is that a dealership?
8         A:   Yes.
9         Q:   Okay.
10        A:   Used car dealership.
11        Q:   Did they ask for any form of proof
12   being able to drive?
13        A:   No.
14        Q:   Did you drive that truck off the lot?
15        MR. HENDRICKSON:  Objection,
16   irrelevant.  Justin, where are you going with
17   this?  It's a completely irrelevant, the issue
18   of, and you know what, I'm stopping it, we are
19   not, you can either talk about citizenship and
20   residency, otherwise the deposition is done.
21        MR. RELIHAN:  For the record, in the
22   case law, these are all relevant materials that
23   the --
24        MR. HENDRICKSON:  Whether you drove
25   off a lot without a license or not is relevant
```

51

```
1         Q:   If you don't have a driver's license,
2    how do you get from point A to point B?
3         A:   Friends, bus, taxi.
4         Q:   How did you get here today?
5         A:   A friend of mine.
6         Q:   What friend?
7         A:   Peggy Zigan.
8         Q:   She dropped you off at your attorney's
9    office?
10        A:   Yes.
11        Q:   Is she going to -- are you going to
12   call her and she's going to take you home
13   today?
14        A:   Yes.
15        MR. HENDRICKSON:  Objection,
16   irrelevant.  You can answer.
17        A:   Yes, she's going to take me back over
18   to my house.
19        Q:   (By Mr. Relihan)  Do you own a car or
20   lease a car?
21        A:   I have a truck.
22        Q:   If you don't have a driver's license,
23   why do you have a truck?
24        A:   Because I'm working on getting my
25   driver's license straightened out.
```

53

```
1    to residency and citizenship?  Tell me where.
2         MR. RELIHAN:  I want to see what proof
3    he gave when he pulled that truck off the lot.
4         MR. HENDRICKSON:  He told you he
5    didn't give any proof.  We're done, move on.
6    Move on or we'll close it up right now.  You've
7    had your chance.  This deposition is limited to
8    the questions of jurisdiction and diversity
9    jurisdiction, you are way afield of it and I'm
10   shutting it down if you keep asking that
11   question.
12        MR. RELIHAN:  All right.
13        Q:   (By Mr. Relihan)  You had a Texas
14   driver's license prior to the one you're
15   applying for currently?
16        A:   Yes.
17        Q:   Okay.  That was last valid in 1998?
18        A:   Yes.
19        Q:   Did you ever renew that license?
20        A:   No, I didn't.
21        Q:   When did you apply for -- have you
22   applied for a Missouri driver's license?
23        A:   I'm trying -- no, I haven't actually
24   applied, I'm trying to get some tickets taken
25   care of so I can apply.
```

54

```
1      Q:   Have you registered the truck in
2  Missouri?
3      A:   Not yet.
4      Q:   If you look at the Answer to No. 12 on
5  the Interrogatories, sir, you just testified
6  that you have not applied for a Missouri
7  license, but then that answer No. 12, is that
8  incorrect?
9          MR. HENDRICKSON:  This is the answer.
10 (Indicating)
11     A:   It's incorrect the way I stated it, I
12 guess.
13     Q:   (By Mr. Relihan)  Okay.  So you're
14 waiting, do you have an outstanding, you're
15 waiting for proof of a payment of a fine in
16 Oregon before you apply for a Missouri license?
17     A:   Yes.
18     Q:   So --
19     A:   They gave me the information as to
20 where I needed to go to to take care of that,
21 and then once I get that letter from Oregon,
22 they'll give me my license.
23     Q:   You say "they" gave you the
24 information, who is "they"?
25     A:   The Missouri driver's license place.
```

55

```
1      Q:   When did you go to the Missouri
2  driver's license place and was told that
3  information?
4      A:   This past month sometime.
5      Q:   This past month in November?
6      A:   No, when did I -- I got the truck
7  October 4th, it was right around that time is
8  when I was trying to get my license going.
9      Q:   But it's fair to state you do not
10 remember the exact date you --
11     A:   No, I don't.
12     Q:   -- went to the driver's license
13 bureau, is that correct?
14     A:   That's correct.
15     Q:   You own that truck, sir?
16     A:   Yes, I do.
17     Q:   Has it been registered in Missouri?
18     A:   No.
19     Q:   Do you know if you need a Missouri
20 license in order to register it?
21     A:   Yes, you do.
22     Q:   Therefore, you need to take care of
23 the license part before you register?
24     A:   Right.
25     Q:   Okay.  Do you have your application --
```

56

```
1  or strike that.  When you bought your truck,
2  was it cash, did you pay all of it up front?
3      A:   I paid cash.
4      Q:   All of it up front?
5      A:   (Witness nods)
6      Q:   Yes?
7      A:   Yes.
8      Q:   Do you have any forms you had to fill
9  out where you bought it?
10     A:   Yes.
11     Q:   Do you have any of those materials?
12     A:   Not with me.
13     Q:   Okay.  Do you have them at home?
14     A:   I believe I do.
15     Q:   Could you forward those to your
16 attorney so I could get a copy.
17     A:   Yes, yes.
18     Q:   Thank you.  Do you remember what
19 address you put on that application?
20     A:   14 Ridgeview Court.
21     Q:   When was the last vehicle you owned
22 prior to this truck?
23     A:   '78 International Scout in '91.
24     Q:   You got rid of it in 1991?
25     A:   Yes.
```

57

```
1      Q:   Okay.  Did you pay income taxes for
2  2005?
3      A:   No, I didn't.
4      Q:   Are you going to be paying any income
5  taxes for 2006?
6      A:   No.
7      Q:   Okay.  When was the last time you paid
8  income taxes?
9      A:   '03, I believe.
10     Q:   Did you pay Illinois state taxes as
11 well?
12     A:   Yes.
13     Q:   Fair to state that the last state
14 income taxes you paid was in Illinois in 2003?
15     A:   Correct.
16     Q:   And you were living at Wilshire at
17 that time?
18     A:   No, I was at 3901 Village Lane.
19     Q:   Thank you.  Your only family is your
20 father and sister in El Paso, Texas?
21     A:   Yes.
22     Q:   You also have a cousin?
23     A:   I have various cousins, but not close.
24     Q:   Your only immediate family is in El
25 Paso, Texas?
```

58

1    A:  Yes.

2    Q:  You don't own any property?

3    A:  No.

4    Q:  Therefore, you have not paid any real

5  estate taxes?

6    A:  No.

7    Q:  Okay.  All your personal property is

8  located at your present address?

9    A:  Yes, it is.

10    Q:  And you're the only one living at your

11  present address, correct?

12    A:  Yes.

13    Q:  Okay.  Is it fair to state that in

14  going back to the Elsberry address, you lived

15  with Leah Fennell, correct?

16    A:  Yes.

17    Q:  Were any of the utilities in your

18  name?

19    A:  No, they weren't.

20    Q:  Did you pay any utilities?

21    A:  No, I didn't.

22    Q:  Is paying utilities part of the lease

23  agreement?

24    A:  No, they weren't.

25    Q:  The lease was, the oral lease was only

59

1  for rent, correct?

2    A:  Correct, utilities included.

3    Q:  Have you set up utilities in your

4  current address?

5    A:  Yes, I have.

6    Q:  What utilities have you set up in your

7  current address?

8    A:  Gas and electric.

9    Q:  Anything else?

10    A:  No.

11    Q:  Who's your gas company do you know?

12    A:  I, Ameren IP, or something like that,

13  they're both Ameren.

14    Q:  Ameren UE, does that sound about

15  right?

16    A:  That's probably right.

17    Q:  They're both gas and electric?

18    A:  Yes.

19    Q:  Okay.  Have you received any bills

20  from them?

21    A:  Not yet.

22    Q:  When did you contact them to set up

23  your service?

24    A:  I believe it was the week before last.

25    Q:  So in November you set it up?

60

1    A:  Yes.

2    Q:  So no time in October 2006 did you

3  ever call an Ameren UE to set up your

4  utilities?

5    A:  No.

6    Q:  Did you fill out any forms for your

7  utility, to set up utilities?

8    A:  I called them on the phone and they

9  came out and hooked them up.

10    Q:  Did they give you like a pink slip

11  showing that they did service and turned it on?

12    A:  I don't know, I don't remember that.

13    Q:  Fair to state that if they did leave

14  you anything, you don't have it anymore?

15    A:  I've been unpacking and everything,

16  throwing stuff away, I have no idea where it

17  might be.

18    Q:  Okay.  I think that's about it.  Do

19  you have -- you said in Answer to 22, in your

20  Interrogatories, that you paid utilities in

21  Illinois in April, do you have any copies of

22  those utility bills?

23    A:  No, I don't.

24    Q:  Okay.  Just so I remember it, the

25  lease that you had entered into for the

61

1  Elsberry, that was for a year, correct?

2    A:  Correct.

3    MR. RELIHAN:  That's all I have.

4              EXAMINATION

5    QUESTIONS BY MR. HENDRICKSON:

6    Q:  I've got some clarification.  Don, on

7  September 13th, 2006, on the date that the suit

8  was initially filed in state court in Illinois,

9  were you living with your cousin Billy Fennell

10  St. Charles County, Missouri.

11    A:  Yes, I was.

12    Q:  Okay.  At that time on September 13th,

13  2006, had you informed me that you had moved to

14  St. Charles County, Missouri?

15    A:  I don't believe I did.

16    Q:  Okay.  At that time, without

17  discussing anything that we've ever discussed,

18  how was it that you and I would communicate,

19  what was my form of contact with you?

20    A:  My cell phone.

21    Q:  Has that always been my form of

22  contact with you?

23    A:  Yes, it has.

24    Q:  And that hasn't changed throughout

25  that period of time?

62

1      A:   No, it hasn't.

2      Q:   Okay.  Including the time when you

3   were in Texas, same cell phone, is that

4   correct?

5      A:   Yes.

6      Q:   From the time you moved in Illinois

7   following your fiance's death in April of this

8   year, did you establish a permanent residency

9   in any state other than Missouri?

10      A:   No.

11      Q:   Did you establish citizenship in any

12   state other than Missouri?

13      MR. RELIHAN:  I'm going to object to

14   the form of the question as it calls for a

15   legal conclusion, outside the purview of this

16   witness' ability to answer.

17      Q:   (By Mr. Hendrickson)  You can go ahead

18   and answer.

19      A:   Would you repeat it?

20      Q:   Did you establish citizenship in any

21   state other than Missouri?

22      MR. RELIHAN:  Same objection.

23      A:   No.

24      Q:   (By Mr. Hendrickson)  On October 13th,

25   2006, the date that Dr. Petrovich's attorneys

63

1   filed a notice of removal from State to Federal

2   Court, were you a resident of Missouri at that

3   time?

4      A:   Yes.

5      Q:   All right.  At that time, were you

6   residing at 817 Randolph in Elsberry, Missouri?

7      A:   Yes, I was.

8      Q:   It was your intent on October 13th,

9   2006 that that would be your permanent

10   residency for the foreseeable future at 817

11   Randolph in Elsberry, Missouri?

12      A:   Yes.

13      Q:   Okay.  There was some confusion as to

14   dates, I think, in the questioning.  You signed

15   an affidavit on October 20th, 2006 that we

16   attached to our Motion to Remand, is that

17   correct?

18      A:   Yes.

19      Q:   And you signed it on October 20th,

20   2006?

21      A:   Yes.

22      Q:   If we look at a calendar, October

23   20th, 2006 was a Friday, that was the date that

24   you -- so you signed this on a Friday, correct?

25      A:   Right.

64

1      Q:   Now, given that that was a Friday on

2   that date, the date that you signed this, had

3   you been removed from 817 Randolph in Elsberry,

4   Missouri?

5      A:   I don't believe I had.

6      Q:   Okay.  Who broke the lease for 817

7   Randolph, Elsberry, Missouri, you or Ms.

8   Fennall?

9      A:   She did.

10      Q:   Okay.  Did she ask you to leave?

11      A:   She ordered me to leave.

12      Q:   She ordered you to leave, all right.

13   And do you remember what day of the week that

14   occurred on?

15      A:   A Wednesday morning.

16      Q:   Okay.  And if the following Wednesday

17   would be October 25th, 2006, would that be the

18   most likely date that she asked you to leave?

19      A:   Yes, I believe that would be pretty

20   close.

21      Q:   Did only a couple of days pass between

22   the time she asked you to leave and the time

23   you found your current residence at 3152

24   Boonslick Road?

25      A:   Yes.

65

1      Q:   All right.  And since you moved in

2   there or made that arrangement on October 27th,

3   2006, would the date that you removed, you were

4   removed from 817 Randolph be the most recent

5   Wednesday before that date?

6      A:   Yes.

7      Q:   And if October 27th, 2006 is on a

8   Friday, that would make that date that you were

9   asked to leave 817 Randolph October 25th, 2006,

10   is that right?

11      A:   Yes.

12      Q:   At the time that you made the

13   arrangements with Leah Fennell at 817 Randolph,

14   you paid rent and a security deposit, is that

15   correct?

16      A:   Correct.

17      Q:   And she has since refunded at least

18   part of the security deposit due to her

19   breaking the lease, right?

20      A:   Correct.

21      Q:   So, on October 13th, 2006, was it, is

22   it clear to you that on that date, you were a

23   resident of Missouri?

24      MR. RELIHAN:  Objection to form.

25      A:   Yes.

1   Q:   (By Mr. Hendrickson)  Were you a

2   resident of Missouri on October 13th, 2006?

3   A:   Yes, I was.

4   MR. RELIHAN:  Object to form,

5   foundation.

6   Q:   (By Mr. Hendrickson)  Were you a

7   resident of Illinois on September 13th, 2006?

8   A:   No, I wasn't.

9   Q:   Were you a resident of Illinois on

10  October 13th, 2006?

11  A:   No, I wasn't.

12  Q:   Okay.  Was the last time you had a --

13  when was the last time you had a permanent

14  residence in Illinois?

15  MR. RELIHAN:  Objection, asked and

16  answered.

17  A:   Prior to May of '06, that was my last

18  real residence.

19  Q:   (By Mr. Hendrickson)  Okay.  Were you

20  ever aware what state Dr. Petrovich was a

21  resident of prior to the filing of Defendant's

22  Motion?

23  MR. RELIHAN:  Object to relevance.

24  Q:   (By Mr. Hendrickson)  You can answer.

25  A:   No, I didn't.

1   Q:   Okay.  On October 3rd, 2006 when you

2   moved into 817 Randolph, Elsberry, Missouri,

3   were you doing that in order to defeat

4   jurisdiction -- diversity jurisdiction in the

5   present litigation?

6   MR. RELIHAN:  Object to the --

7   A:   No.

8   MR. RELIHAN:  Object to the form,

9   foundation, improper questioning, calls for a

10  legal conclusion that this witness clearly

11  didn't know what diversity jurisdiction is or

12  was prior to the filing of this case, but his

13  answer is --

14  MR. HENDRICKSON:  I'll accept that as

15  true.

16  Q:   (By Mr. Hendrickson)  Go ahead.  Were

17  you, were you trying to defeat the --

18  A:   No, I wasn't.

19  MR. RELIHAN:  Same objection.

20  MR. HENDRICKSON:  Same objection, I

21  understand.

22  MR. RELIHAN:  Yes, yes.

23  Q:   (By Mr. Hendrickson)  I'm going to

24  reference you to Deposition Exhibit No. 5,

25  which is our supplemental responses that you

1   filed today, we filed today, that included the

2   production of a copy of your check showing your

3   bank account at Bank of America in St. Charles,

4   Missouri, correct?

5   A:   Correct.

6   Q:   And to open this bank account, you

7   went to the bank branch located in St. Charles?

8   A:   Yes, sir.

9   Q:   Do you remember what street that is

10  on?

11  A:   No, I don't.

12  Q:   Okay.  You gave them a phone number of

13  636-947-8974, whose phone number is that?

14  A:   That was Bill Fennell's home phone.

15  Q:   Okay.  And did you do that with his

16  permission?

17  A:   Yes.

18  Q:   And you gave the address where you

19  were living at that time, 14 Ridgeview Court,

20  correct?

21  A:   Correct.

22  Q:   Okay.  And that was established

23  sometime in September of 2006?

24  A:   Yes.

25  Q:   Okay.  Do you have any bank accounts

1   in your name established with addresses for any

2   other address other than the one in Missouri?

3   A:   No.

4   Q:   And after your fiance's death, when

5   you went to Texas to visit your father, did you

6   have any intent to permanently remain there?

7   A:   Yes, I did.

8   Q:   It was your intent at that time?

9   A:   Yes.

10  Q:   Okay.  When you moved from there in

11  June of 2006, did you have any intent to return

12  back to Texas?

13  A:   No.

14  Q:   Been there, done that?

15  A:   Yep.

16  Q:   Okay.  And is it fair to say that from

17  the period of time when you left your father's

18  residence in Texas until you entered into the

19  rental agreement with Leah Fennell, you didn't

20  have, you didn't rent any property during that

21  period of time?

22  A:   No, I didn't.

23  Q:   Didn't pay any utilities?

24  A:   No.

25  Q:   Didn't have any permanent residency of

70

1  any kind?

2      A:  No, I didn't.

3          MR. HENDRICKSON:  I don't have any

4  other questions.

5                    EXAMINATION

6      QUESTIONS BY MR. RELIHAN:

7      Q:  Just a quick follow up,

8  Mr. Canterbery.  When you went to the driver's

9  license bureau seeking to get a Missouri

10  driver's license and they said you needed to

11  take care of the tickets in Oregon, that issue,

12  did you apply for a Missouri ID card?

13     A:  No, I didn't.

14     Q:  Prior to the lease being broken at

15  Elsberry, from your testimony earlier, is it

16  fair to say that prior to that date, you were

17  aware that it wasn't going to work out with Ms.

18  Pennell?

19     A:  Repeat the question, please.

20     Q:  Okay.  Earlier in this deposition, we

21  talked about that prior to you leaving Elsberry

22  you knew it wasn't going to work out, it wasn't

23  right away, you thought it could work out and

24  then it got to the point where you knew it

25  wasn't going to work out, do you remember

71

1  testifying to that?

2      A:  Yes.

3      Q:  Your counsel asked you questions where

4  you answered that Ms. Pennell broke the lease,

5  correct?

6      A:  Yes.

7      Q:  And through computation, that date we

8  assume based on your testimony is at or around

9  October 25th, 2006?

10     A:  Yes.

11     Q:  A Wednesday, correct?

12     A:  Yes.

13     Q:  What I want to know is; when did you

14  know, before the lease was broken, how many

15  days before that were you aware that it wasn't

16  going to work out?

17     A:  That morning.

18     Q:  No time sooner?

19     A:  No.

20     Q:  Okay.

21         MR. RELIHAN:  That's it.

22         MR. HENDRICKSON:  No other questions.

23  We'll read.

24

25

72

1              STATE OF MISSOURI

2

3                           SS.

4      CITY OF ST. LOUIS

5

6          I, Margaret M. Clodius, a Notary

7  Public in and for the State of Missouri, duly

8  commissioned, qualified and authorized to

9  administer oaths and to certify to depositions,

10  do hereby certify that pursuant to Notice in

11  the civil cause now pending and undetermined in

12  the United States District Court, Southern

13  District of Illinois, to be used in the trial

14  of said cause in said court, I was attended at

15  Husch & Eppenberger, 190 Carondelet Plaza, St.

16  Louis, Missouri, by the aforesaid witness; and

17  by the aforesaid attorneys; on NOVEMBER 14,

18  2006.

19          That the said witness, being of sound

20  mind and being by me first carefully examined

21  and duly cautioned and sworn to testify the

22  truth, the whole truth, and nothing but the

23  truth in the case aforesaid, thereupon

24  testified as is shown in the foregoing

25  transcript, said testimony being by me reported

73

1  in stenotype and caused to be transcribed into

2  typewriting, and that the foregoing pages

3  correctly set forth the testimony of the

4  aforementioned witness, together with the

5  questions propounded by counsel and remarks and

6  objections of counsel thereto, and is in all

7  respects a full, true, correct and complete

8  transcript of the questions propounded to and

9  the answers given by said witness; that the

10  signature of the deponent was not waived by

11  agreement of counsel.

12          I further certify that I am not of

13  counsel or attorney for either of the parties

14  to said suit, not related to nor interested in

15  any of the parties or their attorneys.

16          Witness my hand and notarial seal at

17  St. Louis, Missouri, this 14th day of November,

18  2006.

19          My Commission expires September 26,

20  2010.

21

22

23          _Margaret M. Clodius_

24  - - - - - - - - - - - - - -

25          Notary Public in and for the

              State of Missouri

74

```
 1   Gore Perry Gateway & Lipa Reporting

 2

 3

 4   Attn:  Mr. Todd Hendrickson

 5   Law Office of Todd Hendrickson

 6   100 South Brentwood

 7   Clayton, Missouri  63105

 8

 9   Enclosed please find the Original Signature pages

10   and errata sheets for the deposition of:

11   Donald Canterbery taken 11/14/2006 in the case of:

12   Donald Canterbery vs. John Petrovich, M.D.

13   Please read your copy of the transcript, noting

14   any corrections on the enclosed erratta sheets,

15   and return all pages for filing in court to:

16   Attn:  Mr. Justin Relihan

17   Husch Eppenberger

18   190 Carondelet Plaza

19   St. Louis, Missouri  63105

20

21   Your prompt cooperation will be appreciated.

22   Sincerely,

23

24   Gore Perry Gateway & Lipa Reporting

25
```

78

```
 1   COURT MEMO

 2   UNITED STATES DISTRICT COURT

 3   FOR THE SOUTHERN DISTRICT OF ILLINOIS

 4

 5   Donald Canterbery vs. John Petrovich, M.D.

 6   3:06-cv-792-MJR-PMF

 7

 8   CERTIFICATE OF OFFICER AND

 9   STATEMENT OF DEPOSITION CHARGES

10

11   DEPOSITION OF DONALD CANTERBERY

12   TAKEN ON BEHALF OF THE DEFENDANT

13    11/14/2006

14   Name and address of person or firm having custody of

15   the original transcript:

16   Justin Relihan

17   Husch & Eppenberger

18   190 Carondelet Plaza, Suite 600

19   St. Louis, MO 63105

20

21

22

23

24

25
```

79

```
 1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

 2   Justin Relihan

 3   Husch & Eppenberger

 4   190 Carondelet Plaza, Suite 600

 5   St. Louis, MO 63105

 6   Total:

 7   1 ONE COPY - TAXED IN FAVOR OF:

 8   Todd Hendrickson

 9   Hendrickson, Law Offices of Todd N.

10   7700 Bonhomme, Suite 210

11   Clayton, MO 63105

12   Total:

13

14   Upon delivery of transcripts, the above

15   charges had not been paid.  It is anticipated

16   that all charges will be paid in the normal course

17   of business.

18   GORE PERRY GATEWAY & LIPA REPORTING COMPANY

19   515 Olive Street, Suite 700

20   St. Louis, Missouri 63101

21   IN WITNESS WHEREOF, I have hereunto set

22   my hand and seal on this _____ day of _____

23   Commission expires

24   _____

25   Notary Public
```

75

1 Page **14** Line **20** Should Read:   *Lee, not Leah*

2 Reason for change:   *Misspelled throughout.*

3

4 Page **20** Line **2** Should Read:   *That's not true.*

5 Reason for change: *Deponent was confused as to dates,*

6 *per subsequent testimony.*

7 Page **22** Line **22** Should Read: *It had to have been around*

8 Reason for change:   *the 25th.*

9 *Mistake as to date, per subsequent testimony P.64/L.19*

10 Page **24** Line **5** Should Read:   *A: other than 917 Randolph*

11 Reason for change:

12 *to Subsequent correction, p 24/l.11*

13 Page Line Should Read:

14 Reason for change:

15

16 Page Line Should Read:

17 Reason for change:

18

19 Page Line Should Read:

20 Reason for change:

21

22 Page Line Should Read:

23 Reason for change:

24

25

1   Comes now the witness, Donald Canterbery,

2   and having read the the foregoing transcript

3   of the deposition taken on the 11/14/2006,

4   acknowledges by signature hereto that it is a

5   true and accurate transcript of the testimony given

6   on the date hereinabove mentioned.

7

8

9   _____

10  Donald Canterbery

11

12  Subscribed and sworn to me before this

13  15th day of December ,2006.

14  My Commission expires

15

16  Todd N. Hendrickson - Notary Public
    Notary Seal, State of
    Missouri - St. Louis County
    Commission #05551975
17  My Commission Expires 4/5/2009

18  Notary Public

19

20

21

22

23

24

25